UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ALAN KRESS and RANDY CARR,   )
on behalf of a class of those   )
similarly situated,   )
   )
     Plaintiffs,   )
     vs.   )   No. 1:08-cv-00431-LJM-DML
   )
CCA OF TENNESSEE, LLC d/b/a   )
CORRECTIONS CORPORATION   )
OF AMERICA, MARION   )
COUNTY SHERIFF FRANK   )
ANDERSON, VIRGINIA LEE,   )
TIMOTHY LITTLE, JEFF CONWAY,   )
and NEIL PROBST,   )
   )
     Defendants.   )

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on defendants', CCA of Tennessee, LLC ("CCA"), Virginia Lee ("Lee"), Timothy Little ("Little"), Jeff Conway ("Conway"), and Neil Probst ("Probst") (Lee, Little, Conway, and Probst collectively, "Employee Defendants"), and Marion County Sheriff Frank Anderson ("Sheriff") (collectively, "Defendants"), Motion for Summary Judgment [Dkt. No. 122]. The Court has considered the parties' submissions and, for the reasons set forth below, **GRANTS** Defendants' Motion for Summary Judgment [Dkt. No. 122].

## I.  BACKGROUND

CCA is a private corporation specializing in running correctional facilities under contract with local law enforcement agencies. Dkt. No. 111 at 1. Under contract with the

Marion County Sheriff's Department ("Marion County"), CCA operates Marion County Jail #2 ("Jail #2"), located at 730 East Washington Street, Indianapolis, Indiana.  *Id.* at 1–2. The Employee Defendants all work for CCA at Jail #2.  Lee is a unit manager at Jail #2. *Id.* at 2.  Little is the health services administrator at Jail #2.  *Id.*  Probst is a doctor providing medical services to Jail #2 inmates.  *Id.*  Conway is the warden of Jail #2.  *Id.*

Plaintiffs Alan Kress ("Kress") and Randy Carr ("Carr") (collectively, "Plaintiffs") are inmates who were incarcerated at Jail #2 at the time this suit was filed.  In April 2008, Plaintiffs filed this Section 1983 suit challenging the conditions at Jail #2 on behalf of themselves and those similarly situated.  Dkt. No. 1.  Plaintiffs alleged a number of violations of state and federal law, regarding such issues as inmate mail procedure, availability and handling of grievances, medical care, privacy of medical information, cruel and unusual sanitation and overcrowding conditions, and improper financial incentives being paid to Jail #2 administrators.  *See generally id.*

On December 1, 2010, following briefing from the parties, the Court issued an Order on Plaintiff's Motion for Class Certification ("Class Certification").  Dkt. No. 111.  The Court certified a class encompassing "[a]ny and all persons currently, or who will be in the future, confined to the Jail #2 facility" with Kress and Carr as class representatives seeking injunctive and declaratory relief.  *Id.* at 15.  Because neither Kress nor Carr was incarcerated at Jail #2 at the time the Class Certification was issued, the Court dismissed all claims brought on their behalf individually as moot.  *Id.*  In addition, certain counts of the Amended Complaint were dismissed as improper for class treatment.  *Id.* at 9–12.  The following counts of the Amended Complaint [Dkt. No. 17] remain:

#	Counts Three, Four, and Fourteen, alleging that Jail #2's conditions violate

the Eighth and Fourteenth Amendments of the United States Constitution, as well as the Indiana Jail Standards. Dkt. No. 17 ¶¶ 86–87, 99.

\#      Counts Ten and Eighteen, alleging improper disclosure of inmate health information in violation of the Health Insurance Privacy Portability Act ("HIPAA"). *Id.* ¶¶ 94–95, 103.

\#      Counts Twelve and Twenty, alleging the payment of incentives to Jail #2 administrators to encourage constitutional violations. *Id.* ¶¶ 97, 105.

On January 28, 2011, Defendants filed a Motion for Summary Judgment on the remaining counts. Dkt. No. 122. In support of summary judgment, Defendants submitted an affidavit from Conway, as well as discovery responses from Plaintiffs. *See generally id.* In opposition, Kress and Carr presented their own statements. *See generally* dkt. nos. 124-1, 124-2. In addition, Plaintiffs presented affidavits from Keith Harkness ("Harkness") and Timothy-Patrick Treacy ("Treacy"), two other inmates who were incarcerated in Jail #2. *See generally* dkt. nos. 124-3, 124-4.

Kress was incarcerated in Jail #2 in 2007 and 2008 while awaiting trial. Dkt. No. 124-2 ¶¶ 1–2. Upon arrival at Jail #2, he was held in a small pre-intake room with approximately twenty-five other inmates. *Id.* ¶ 3–4. The pre-intake room had two small benches, and most of the inmates had to stand. *Id.* ¶ 5. Inmates were confined to the pre-intake room, which had one toilet and no running water, for six to eighteen hours without food or water. *Id.* ¶¶ 6–8. After the pre-intake room, Kress was taken to the "big room," which housed 100–150 inmates for two to eight days. *Id.* ¶¶ 11, 13. Inmates in the big room slept on the floor in "plastic boats," and there was only one bathroom and one sink for all the inmates in the room. *Id.* ¶¶ 12, 14–16. Kress also saw gnats in the bathroom and several other locations within Jail #2, as well as mold around bathrooms, sinks, and showers. *Id.* ¶¶ 21–22. Kress has not been incarcerated at Jail #2 since August 19, 2008.

Dkt. No. 122-4 ¶ 4.

Beginning on February 28, 2008, Carr was incarcerated at Jail #2. *Id.* ¶ 3. He was confined to the pre-intake cell with approximate twenty-eight other inmates for eighteen hours without food or drinking water. Dkt. No. 124-1 at 3–4. Upon leaving the pre-intake cell, Carr was moved to the big room where he remained for six to eight days with approximately 150 other inmates. *Id.* at 6. He received sack lunches in the big room three times a day. *Id.* at 7. Carr was transferred out of Jail #2 on August 5, 2008, and has not returned since. Dkt. No. 122-4 ¶ 3.

Affiant Harkness was incarcerated at Jail #2 on two occasions, in the spring of 2007 and again from January 31, 2010 until March 5, 2010. Dkt. No. 124-3 ¶ 2. Harkness stated that the pre-intake room was approximately thirteen feet by thirteen feet square and housed twenty to thirty inmates. *Id.* ¶ 3. After the pre-intake room, Harkness was taken to the "Katrina Room" for three to five days. *Id.* ¶¶ 8–9, 12. More than 100 inmates were housed in the Katrina Room, which had one sink, one toilet, and no showers. *Id.* ¶¶ 10, 13. Harkness saw gnats in the bathrooms and around trash cans in Jail #2. *Id.* ¶ 15. He also saw mold growing in showers, bathroom areas, and vents in the facility and reported that "[p]eople had respiratory illnesses." *Id.* ¶ 16.

Affiant Treacy has been incarcerated at Jail #2 on three occasions: 2007, 2008, and from February 2011 to the present. *Id.* ¶ 2. Treacy was not at Jail #2 between September 11, 2009 and February 2011. *Id.* During his 2007 and 2008 incarcerations, Treacy started in the pre-intake room, which was approximately thirteen feet by thirteen feet and held thirty to forty inmates. *Id.* ¶¶ 4–5. The pre-intake room was "very hot," and the inmates remained there "for several hours." *Id.* ¶¶ 8–9. Treacy then was moved to the Katrina

Room, where he spent two or more days waiting for a dorm assignment. *Id.* ¶¶ 10, 14. The Katrina Room had one toilet and no working sinks, and inmate sleeping "boats" filled "almost all the floor space in the room." *Id.* ¶¶ 12–13. Treacy also reported gnats in the toilets and living area, as well as "black mold" in the air vents and showers. *Id.* ¶¶ 17–18. However, Treacy acknowledges that "[s]ince returning to Jail #2 this month [February 2011], I witnessed that there have been substantial changes to the running of the facility." *Id.* ¶ 20.

Beginning in May 2008, CCA computerized the intake process, significantly lessening the time spent in the intake process. Dkt. No. 122-4 ¶ 5. The current pre-intake room is a recreation room on the first floor of Jail #2 with a toilet, sink, and water fountain, and inmates are generally held in the pre-intake room for less than six hours. *Id.* ¶ 6. After pre-intake, inmates are transferred to a fourth floor dorm area designed to hold and sleep up to 148 inmates. *Id.* ¶ 7. This area is regular housing unit with forty-two individual cells, each with bunks, sinks, and toilets. *Id.* In addition, the fourth floor dorm area has three drinking fountains, six toilets, six sinks, and six showers. *Id.*

CCA follows "regular housekeeping plans and procedures" to keep Jail #2 clean, including regular inspections. *Id.* ¶ 10. Mold is reported to the responsible unit manager for cleaning. *Id.* In addition, in late 2009, shower and drying areas of Jail #2 were stripped and refinished with an epoxy system on floors, walls, and ceilings, including an anti-microbial to fight fungi and microbes. *Id.* Arab Pest Control performs monthly insect inspections and treatments, and additional insect treatments are performed on an as-needed basis. *Id.* ¶ 11.

The Court includes additional facts below as necessary.

## II.  LEGAL STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a material fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine dispute of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine dispute of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable

inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III.  DISCUSSION[1]

#### A.  HIPAA

Defendants contend that Plaintiffs' claims for violations of HIPAA must fail as a matter of law because HIPAA does not grant a private right of action. Although the Seventh Circuit has not directly addressed the issue, Plaintiffs concede, in accordance with

---

[1] As an initial matter, Defendants contend that Plaintiffs' response fails to comply with Local Rule 56.1 by failing to refute specifically each of Defendants' numbered facts. *See* S.D. Ind. L.R. 56.1(b). Instead, Plaintiffs provide a paragraph entitled "Statement of Material Facts by CCA Defendants Which Are Disputed." Dkt. No. 124 at 6. The Court concludes that Plaintiffs' noncompliance is minor and, therefore, will excuse such noncompliance. *Accord* S.D. Ind. L.R. 56.1(i) ("The Court may, in the interests of justice . . . excuse failure to comply strictly with the terms of this rule.").

the decisions of numerous courts that have considered the issue, that HIPAA does not provide a private cause of action. *See, e.g.*, *Acara v. Banks*, 470 F.3d 569, 571–72 (5th Cir. 2006) (collecting cases); *Doe v. Bd. of Trustees of Univ. of Ill.*, 429 F. Supp. 2d 930, 944 (N.D. Ill. 2006) ("HIPAA provides civil and criminal penalties for improper disclosures of medical information, but it does not create a private cause of action, leaving enforcement to the Department of Health and Human Services alone."). Because HIPAA does not confer a private right of action for violations, it is unnecessary to evaluate whether Plaintiffs would be able to show a HIPAA violation. Defendants' Motion for Summary Judgment is **GRANTED** on Plaintiffs' HIPAA claims, and these claims must be **DISMISSED**.

## B. EIGHTH AND FOURTEENTH AMENDMENT CLAIMS

Technically, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions"—that is, the Eighth Amendment applies only to post-conviction prisoners. *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) (citing *United States v. Lovett*, 328 U.S. 303, 317–18 (1946)). Pretrial detainees' rights are evaluated under the Due Process Clause of the Fourteenth Amendment. *Id.* However, the analysis applied to alleged violations is the same under both the Eighth and Fourteenth Amendments. *Estate of Perry ex. rel Perry v. Boone Cnty. Sheriff*, No. 05-CV-1153, 2008 WL 694696, at *15 n.4 (S.D. Ind. Mar. 12, 2008) (McKinney, J.) (citing *Barrie v. Grand Cnty.*, 119 F.3d 862, 868 (10th Cir. 1997); *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996)); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("the due process rights of a [pretrial detainee under the Fourteenth Amendment] are at least as great as the Eighth Amendment protections

available to a convicted prisoner."). When discussing the Eighth Amendment in this Order, the Court includes parallel rights under Fourteenth Amendment Due Process.

## 1.  CURRENT EXISTENCE OF CONDITIONS

As an initial matter, Defendants contend that liability cannot be based on conditions existing at Jail #2 in 2008, when Kress and Carr were held there, in light of evidence that the conditions have been changed subsequently.  Plaintiffs, in contrast, contend that they should be able to rely upon conditions at Jail #2 as they existed when this suit was filed in April 2008.  Under Section 1983, declaratory or injunctive relief is only proper if there is a continuing violation of federal law.  *Green v. Mansour*, 474 U.S. 64, 73 (1985); *see also Woods v. New Albany Police Dep't*, No. 4:10-CV-2, 2010 WL 3398938, at *4 (S.D. Ind. Aug. 25, 2010) (Young, J.) ("If the court were to grant Plaintiff's request for declaratory or injunctive relief, it would not be the kind of prospective relief intended under Section 1983, as it would be relief from a past constitutional violation, rather than relief from future or continuing violations of federal law.").  Plaintiffs' remaining causes of action are only for injunctive and declaratory relief, not damages.  *See generally* dkt. no. 111.  Because the relief in this case would be limited to injunctive or declaratory relief, the Court concludes that evidence regarding Defendants' remedying of conditions is relevant and should be considered in conjunction with Plaintiffs' evidence regarding previous conditions.  *Accord. Green*, 474 U.S. at 73.

## 2.  INVOLVEMENT OF INDIVIDUAL DEFENDANTS

Defendants further assert that there is no evidence that the Employee Defendants

or the Sheriff were personally involved in the alleged Eighth and Fourteenth Amendment violations. Therefore, Defendants contend, the constitutional claims against the Employee Defendants and the Sheriff must be dismissed as a matter of law.

Section 1983 does not allow for *respondeat superior* liability. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). Instead, a state officer may be held liable only if he is "personally involved" in the constitutional violation at issue. *See Knight v. Wiseman*, 590 F.3d 458, 462–63 (7th Cir. 2009). In addition, an officer may be liable in his official capacity if the constitutional violation at issue resulted from an "official policy or custom" over which the officer has ultimate policymaking authority. *Perkins*, 312 F.3d at 875 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–22 (1988); *Abbott v. Vill. of Winthrop Harbor*, 205 F.3d 976, 981 (7th Cir. 2000)). With these standards in mind, the Court examines the individual Defendants in this action.

Plaintiffs concede that some of the Employee Defendants no longer belong in this case. In their response to the Motion for Summary Judgment, Plaintiffs concede that because the Court previously dismissed Plaintiffs' claims arising from grievance procedures, Lee is no longer an appropriate defendant in this action. Dkt. No. 124 at 8. Plaintiffs further concede that defendants Little and Probst were included in this action due to their role in alleged HIPAA violations. *Id.* at 8–9. Because the Court concludes that Plaintiffs' HIPAA claims must be dismissed, Little and Probst are no longer appropriate defendants in this action. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** in its entirety as applied to defendants Lee, Little, and Probst, and all claims against them are **DISMISSED**.

However, Conway and the Sheriff require closer attention. Defendants do not

dispute that both have ultimate policymaking authority over Jail #2. In other cases involving prison conditions, the Seventh Circuit has recognized that sheriffs and wardens "can be expected to know of or participate in creating systemic, as opposed to localized, situations." *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996). In this case, the conditions Plaintiffs challenge as a deprivation of their Eighth Amendment rights include mold, insect infestations, and overcrowding in intake rooms. As opposed to previously-dismissed claims in this case such as failure to provide certain medications or mishandling of mail, *see generally* dkt. nos. 111 & 121, the present complaints concern facility-wide issues rather than localized ones. *Cf. Antonelli*, 81 F.3d at 1429 (dismissing § 1983 claims against warden and sheriff for refusals of individual prisoner requests). The Court, therefore, cannot conclude that claims against Conway and the Sheriff are precluded due to lack of personal involvement as a matter of law.


### 3. EIGHTH AMENDMENT VIOLATIONS

Plaintiffs contend that the conditions of Jail #2 violate their Eighth Amendment rights. The Eighth Amendment protects against the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII; *see also Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). Prison conditions "may be harsh and uncomfortable without violating the Eighth Amendment[]." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994)); *see also Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("[T]he Constitution does not mandate comfortable prisons[.]"). However, prisoners are entitled to "the minimal civilized measure of life's necessities." *Dixon*, 114 F.3d at 642. A combination of conditions may constitute an Eighth Amendment violation, even when one

of those conditions in isolation would not, when the combination has "a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise[.]" *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Overall, the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

When determining prison official liability under the Eighth Amendment, violations are addressed under the deliberate indifference standard. *Mayoral*, 245 F.3d at 938. A prison official may be liable under the Eighth Amendment when he "knows of and disregards an excessive risk to inmate health or safety." *Id.* This standard includes objective and subjective prongs: there must be an "objective risk of danger," and the official in question must have had actual knowledge of the risk. *Id.* (citing *Henderson v. Sheahan*, 196 F.3d 839, 844–45 (7th Cir. 1999)). It is not enough that prison officials acted negligently. *Id.* However, a prison official may be found liable without "desir[ing] the harm to befall an inmate." *Id.* at 939. A prison condition suit fails "[i]f the harm is remote rather than immediate, or the officials don't know about it or can't do anything about it[.]" *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). Plaintiffs point to a number of conditions[2] they allege constitute a deprivation of their Eighth Amendment rights, including gnat infestation, mold, and the conditions of confinement during intake. The Court addresses these conditions in turn.

---

[2] In addition to the issues addressed in this Order, Plaintiffs discuss the conditions of the segregation cells. Dkt. Nos. 124-2 ¶¶ 17–20; 124-3 ¶ 17; 124-4 ¶¶ 15–16. However, Plaintiffs did not identify any issues with regard to segregation cells in their answers to interrogatories or depositions. *See generally* dkt. nos. 122-1, 122-2. The only issue with segregation cells addressed in Plaintiffs' depositions involves Carr's contention that he did not receive proper medication while in segregation. Dkt. No. 122-3 at 3–4. Plaintiffs may not contradict their prior deposition and interrogatory responses with subsequent affidavits. *Lorillard Tobacco Co., Inc. v. A&E Oil, Inc.*, 503 F.3d 588, 593 (7th Cir. 2007). To the extent that Plaintiffs seek to do so now, the Court will disregard their presented evidence.

Plaintiffs have presented affidavits stating that inmates saw gnats in bathrooms, around trash cans, and in other places in Jail #2 as late as February 2011. Dkt. Nos. 124-2 ¶ 21; 124-3 ¶ 15; 124-4 ¶ 17. Defendants present an affidavit from Conway stating that Jail #2 is inspected and treated for insects monthly. Dkt. No. 122-4 ¶ 11. Additionally, Defendant present answers to interrogatories in which Kress discusses "gnats in the bathroom which were eventually cleaned up." Dkt. No. 122-1 at 2–3. Taken in the light most favorable to Plaintiffs, *accord. Estate of Cole*, 94 F.3d at 257, there is sufficient evidence to create a genuine dispute as to whether gnats are present at Jail #2. However, there is no evidence that any gnats present at Jail #2 caused injuries of any kind to any prisoner beyond annoyance. Although prolonged pest infestation may constitute a constitutional deprivation, the Court concludes that the gnat presence identified in this case is not severe enough to constitute such a deprivation. *See Johnson v. Pollard*, No. 08-CV-297, 2009 WL 3063327, at *13–14 (E.D. Wis. Sept. 16, 2009) (gnats in prisoner cell insufficient to constitute constitutional violation); *see also Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (cockroaches in prisoner cell insufficient to constitute constitutional violation, even though prisoner was bitten by them at least twice).

Plaintiffs' evidence indicates that Jail #2 had black mold in air vents and shower facilities. Dkt. Nos. 124-2 ¶ 22; 124-3 ¶ 16; 124-4 ¶ 18. Affiant Keith Harkness states that "[p]eople had respiratory illnesses[]" connected to the mold. Dkt. No. 124-3 ¶ 16. However, none of Plaintiffs' affiants indicate any basis for their belief that the substance observed was in fact black mold or caused any respiratory illnesses, *see* dkt. no. 122-5 at 64 & 66, and Defendants contend that the affiants are mistaken in believing that the substance was mold. In addition, Defendants have introduced evidence that Jail #2's shower facilities

13

were refinished in late 2009 and that any mold at Jail #2 is cleaned during routine housekeeping. Dkt. 122-2 ¶ 10. In his deposition, Plaintiff Kress confirmed that Jail #2 took steps to clean the "mold," but he did not believe they "got it accomplished." Dkt. No. 122-5 at 56. Although Plaintiffs have shown a genuine dispute of fact as to the existence of mold at Jail #2, *accord. Estate of Cole*, 94 F.3d at 257, without evidence of illnesses resulting from the so-called mold, the Court concludes that Plaintiffs' allegations are insufficient to rise to the level of a constitutional violation. *Cf. Board v. Farnham*, 394 F.3d 469, 485–86 (7th Cir. 2005) (mold and black fiberglass in air vents resulting in respiratory problems and nosebleeds sufficient for Eighth Amendment violation); *Lapine v. Caruso*, 2011 WL 588774, at *5 (W.D. Mich. Feb. 10, 2011) (collecting cases for the proposition that "mild to moderate symptoms from allergic reactions to common allergens like dust, mold and mildew do not rise to constitutional dimension").

In their challenge to conditions during the intake process, Plaintiffs discuss two areas: the "pre-intake room"[3] and the "Katrina Room." Plaintiffs allege that in the pre-intake room, which measures approximately fifteen by fifteen feet, twenty to thirty inmates are confined with only one toilet and no running water. Dkt. Nos. 124-1 at 3–5; 124-2 ¶¶ 4, 6–7; 124-3 ¶¶ 3–4; 124-4 ¶¶ 4–5, 7. Inmates can be held in the pre-intake room for up to eighteen hours without food or water in "stifling" heat, and there is only enough room for six inmates to sit down, while the rest must stand. Dkt. Nos. 124-1 at 3; 124-2 ¶¶ 5, 8–9;124-3 ¶¶ 5–6; 124-4 ¶¶ 6, 8. Defendants contend that the intake process has been revised such that inmates are held in the pre-intake room, which has a toilet, sink, and water fountain, for less than six hours. Dkt. No. 122-4 ¶¶ 5–6. Once again, Plaintiffs fail

---

[3] This has also been referred to as the "Forever Room." *See* Dkt. No. 122-1 at 3.

to suggest that any physical or mental injury occurred as a result of the conditions of the pre-intake room, and the Court is unconvinced that Plaintiffs' allegations amount to a constitutional violation. *Cf. Carston v. Sacks*, No. 2:03-CV-1490, 2007 WL 41005786, at *3–*5 (W.D. Pa. Mar. 30, 2007) (denial of food and water for four days not a constitutional violation); *Jensen v. Lake Cnty.*, 958 F. Supp. 397, 406 (N.D. Ind. 1997) (overcrowding is not *per se* unconstitutional).

Following processing in the pre-intake room, inmates are sent to the "Katrina Room" while awaiting dorm assignments. Dkt. No. 124-4 ¶ 10. 100 to 150 inmates are housed in the Katrina Room, where they sleep in plastic boats on the floor for six to eight days. Dkt. Nos. 124-1 at 6–7; 124-2 ¶¶ 11, 13–16; 124-3 ¶¶ 9–12, 14; 124-4 ¶ 11–12, 14. The Katrina Room has one toilet and one sink. Dkt. Nos. 124-1 at 6–7; 124-2 ¶ 12; 124-3 ¶ 13; 124-4 ¶ 13. Like the pre-intake room, Defendants have made significant changes to the "Katrina Room" portion of the intake process. Following processing in the pre-intake room, inmates are taken to a dorm area designed to hold and sleep up to 148 inmates. Dkt. No. 122-4 ¶ 7. The dorm is a regular housing unit including bunks, cells, three drinking fountains, six toilets, six sinks, and six showers, as well as sinks and toilets in each of the forty-two cells. *Id.* The Court concludes that, however bad conditions may have been in the "Katrina Room" at one time, the conditions at this stage of the intake process are not currently constitutionally deficient. *Accord. Dixon*, 114 F.3d at 642.

Although the Court remains unconvinced that the conditions in Jail #2 are severe enough to constitute constitutional violations, even assuming that the conditions are severe enough to constitute a deprivation of Plaintiffs' Eighth Amendment rights, the evidence

before the Court shows that Defendants were not deliberately indifferent[4] to the conditions. There is no evidence that Defendants disregarded inmate health and safety in operating Jail #2. In fact, all evidence in the record indicates that Defendants have taken steps to improve conditions at Jail #2. *See generally* dkt. no. 122-4; *see also* dkt. no. 124-4 ¶¶ 4, 20 (comparing previous conditions and stating, "Since returning to Jail #2 this month, I witnessed that there have been substantial changes to the running of the facility."); dkt. no. 122-1 at 2–3 (gnats "were eventually cleaned up"). In short, there is no evidence that Defendants continue to "disregard[] an excessive risk to inmate health or safety" such that injunctive relief is appropriate. *Mayoral*, 245 F.3d at 938. Because Plaintiffs have not brought forth evidence demonstrating a genuine dispute of material fact as to the presence of a continuing constitutional violation, Defendants are entitled to summary judgment. *Accord. Green*, 474 U.S. at 73.

## C. INDIANA JAIL STANDARDS

Defendants contend that they are entitled to summary judgment on Plaintiffs' accusations under the Indiana Jail Standards ("Standards") because, like HIPAA, the Standards do not provide a private right of action. It is well-established that the Standards do not provide a private right of action for monetary damages. *See, e.g.*, *Malone v. Becher*,

---

[4] Plaintiffs argue that, in case the pretrial detainees, a lower standard applies because "[t]he Due Process Clause prohibits any kind of punishment—not merely cruel and unusual punishment—of a pretrial detainee[,]" and therefore, Defendants must show that any conditions of confinement are not for the purpose of punishment. Dkt. No. 124 at 11 (quoting *Antonelli*, 81 F.3d at 1425; *Bell*, 441 U.S. at 535 n.16); *but see Estate of Perry*, 2008 WL 694696, at *15 n.4 (applying the same standard under the Eighth and Fourteenth Amendments). However, Plaintiffs acknowledge that *Antonelli* still requires application of the deliberate indifference standard. *Antonelli*, 81 F.3d at 1425 (citing *Salazar v. City of Chi.*, 940 F.2d 233, 238 (7th Cir. 1991)) ("A prison official violates the constitutional rights of a pretrial detainee only when he acts with deliberate indifference. Conduct is deliberately indifferent when the defendant acts in an intentional or criminally reckless manner.").

No. NA-01-101, 2003 WL 22080737, at *19–*20 (S.D. Ind. Aug. 29, 2003) (Hamilton, J.).

Plaintiffs contend that *Malone* and its progeny do not preclude suits for injunctive relief under the Standards, particularly when the jail in question is run by a private, rather than governmental, entity.

The Court previously dealt with a similar issue in this litigation when it determined that, as to Plaintiffs' claims regarding grievance procedures, neither the Prison Litigation Reform Act or the Standards provided a private right of action. Dkt. No. 109 at 5–6. In that Order, the Court stated:

> The courts in *Malone* and *Tyson* [*v. Grant Cnty. Sheriff*, No. 07-CV-10, 2007 WL 1395563 (N.D. Ind. May 9, 2007)] analyzed the Standards and the statute under which the Standards were promulgated and found that Indiana's General Assembly provided a remedy for a violation of the Standards—but not a private right of action for inmates. *Malone*, 2003 WL 22080737, at *19–*20; *Tyson*, 2007 WL 1395563, at *8–*11. Specifically, the remedy provided by Indiana's General Assembly is that "the sheriff [may] bring an action in the circuit court . . . for appropriate mandatory or injunctive relief[,]" after the Department of Corrections investigates and notifies the jail of the violation. Ind. Code § 11-12-4-2. The Court agrees with the *Malone* and *Tyson* courts that the Indiana General Assembly contemplated a specific remedy for potential violations of the Standards and did not intend to provide inmates with a private right of action to enforce the grievance process requirement in the Standards.

*Id.* at 5–6. The Court now expands this reasoning to encompass Plaintiffs' remaining claims under the Standards.

In doing so, the Court finds the reasoning of our sister court in *Tyson* to be highly persuasive.[5] In *Tyson*, Judge Lozano of the Northern District of Indiana examined similar claims for injunctive and declaratory relief under the prison condition provisions of the

---

[5] Plaintiffs contend that the Court should disregard *Tyson* as it "hails from the Northern District [and] is not binding on this court." Dkt. No. 124 at 15. Plaintiffs go on to argue that "Indiana courts are the ultimate determiner of Indiana law, not the federal courts." *Id.* However, in absence of any Indiana state cases directly on point, the Court is fully within its discretion to consider well-reasoned opinions by sister courts.

Standards and found no private right of action. 2007 WL 1395563, at *7–*11. While *Malone* specifically addressed damages, not injunctive relief, *Tyson* expands the reasoning of *Malone* to encompass all forms of relief not specifically provided by statute. *Id.* Like the *Tyson* court, this Court concludes that, as a matter of law, the Standards preclude all private rights of action by prisoners, regardless of the type of relief requested.

Plaintiffs contend that *Tyson* should not apply when the sheriff has contracted jail oversight to a private company. Because the sheriff is legally responsible for running county jails, *see* Ind. Code § 36-2-13-5(a)(7) (2010), Plaintiffs argue that failure to comply with the Standards would make the Sheriff a defendant rather than a plaintiff and "[c]ertainly the Sheriff is not going to sue his alter ego, or the contractor he oversees, for not complying with jail regulations." Dkt. No. 124 at 15. However, Plaintiffs have not shown why this makes jails run under contract with a private company any different than county-run jails. In both cases, under Plaintiffs' logic, the county sheriff would have to sue himself.[6] In addition, Plaintiffs' argument ignores the fact that the Standards allow either the county sheriff or the commissioner of the department of corrections to file suit to enforce the Standards. *See* Ind. Code § 11-12-4-2(b) (2010). As far as the Standards are concerned, the Court is unconvinced that a privately-run jail is subject to suit by prisoners to enforce the Standards any more than a county-run jail. Regardless of the party operating the jail, the Standards preclude private rights of action for prisoners to enforce them, and Defendants Motion for Summary Judgment is **GRANTED** as to these claims.

---

[6] Plaintiffs contend that "[t]he only way to render [the sheriff suit] provision with some rationality is to assume there are occasions when a county sheriff may have to sue the county's fiscal body (the county commissioner or county council) to ensure that the Sheriff has the funds to comply with the Indiana Jail Standards." Dkt. No. 124 at 15. Contrary to Plaintiffs' implication, the Court is convinced that a suit by the sheriff against the county fiscal body is exactly what the General Assembly intended in enacting the Standards.

## D. FINANCIAL INCENTIVES PAID TO JAIL ADMINISTRATORS

Defendants contend that the undisputed evidence shows no improper incentives were paid to jail administrators to perform acts violating Plaintiffs' constitutional rights.[7] The only evidence Plaintiffs have introduced involves how the amount of grievances affects Jail #2's rating by the American Correctional Association ("ACA"). *See generally* dkt. no. 80-1. However, Plaintiffs admit that they have not provided any evidence that CCA pays financial incentives to its administrators based either on ACA ratings or any other factor. Dkt. No. 124 at 17 & n.10. Defendants have presented evidence that CCA does not pay incentives to administrators to act in an unconstitutional manner. Dkt. No. 122-2 ¶ 12. Plaintiffs suggest that the Court should infer the paying of financial incentives based on findings in other cases against CCA in other courts. *See Bowman v. Corrections Corp. of Am.*, 350 F.3d 537, 542 (6th Cir. 2003) (jury found that doctor was paid incentives by CCA to reduce costs of medical treatment). However, the Court must decide summary judgment based on the evidence present before it, not hypothetical evidence which may or may not exist. *Accord.* Fed. R. Civ. P. 56(e). Plaintiffs have provided no evidence that CCA provides incentives of any kind to its administrators, let alone that those incentives depend on or encourage constitutionally-suspect policies for inmate treatment. Defendants are entitled to summary judgment for these claims.

---

[7] Defendants further contend that Plaintiffs have not even stated a cause of action in this regard. However, because the Court finds that Plaintiffs have not produced sufficient evidence on this claim as a factual matter, the Court concludes that it is unnecessary to address this contention.

## IV.  CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment [Dkt. No. 122] is **GRANTED** in its entirety.  Judgment shall issue accordingly.

IT IS SO ORDERED this 13th day of April 2011.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

William A. Hahn
BARNES & THORNBURG LLP
william.hahn@btlaw.com

Jennifer Lynn Haley
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
jhaley@indy.gov

Adam  Lenkowsky
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com

Paul K. Ogden
ROBERTS & BISHOP
pogden@roberts-bishop.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com

Kenneth T. Roberts
ROBERTS & BISHOP
ktrjustice@aol.com

Tasha Rebecca Roberts
ROBERTS AND BISHOP
troberts@roberts-bishop.com

Michael  Rosiello
BARNES & THORNBURG LLP
mike.rosiello@btlaw.com

Marc Pe-Caine Sultzer
OFFICE OF CORPORATION COUNSEL
msultzer@indygov.org